## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| **ROY KELLNER**, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:17-cv-4048 |
| vs. | ) | |
| | ) | |
| **LAKEVIEW LOAN SERVICING,** | ) | |
| **LLC,** a Delaware Limited Liability | ) | Trial By Jury Demanded |
| Company; **CENLAR FSB, d/b/a/** | ) | |
| **Central Loan Administration &** | ) | |
| **Reporting,** a federally chartered | ) | |
| savings bank; and **M&T BANK** | ) | |
| **CORPORATION,** a New York | ) | |
| banking corporation, | ) | |
| | ) | |
| Defendants. | | |

## COMPLAINT

Plaintiff, Roy Kellner, by and through counsel, for his Complaint against

defendants Lakeview Loan Servicing, LLC, Cenlar FSB and M&T Bank

Corporation, states as follows:

### INTRODUCTION, PARTIES, JURISDICTION, AND VENUE

1. Plaintiff Roy Kellner (referred to hereinafter as "Plaintiff" or

"Kellner") is the owner of real property and improvements located at and

commonly known as 1813 Dodge Ave., Evanston, Illinois 60201 (the "Home").

2.  Kellner purchased the Home on October 15, 2015 as his primary, principal residence and financed that purchase by receiving a loan as evidenced by a note (the "Note") and a mortgage on the Home that allegedly secures the Note (the "Mortgage") (collectively referred to hereinafter as the "Loan"). A copy of the Loan is attached as ***Exhibit 1***.

3.  Kellner finds himself on the brink of foreclosure through no fault of his own. He has timely paid each and every payment on his Loan and has otherwise fully lived up to his obligations. The mortgage loan servicers responsible for Kellner's Loan have paid someone else's taxes and then sought to charge those amounts to Kellner. Kellner has done everything in his power to have these errors corrected, but all efforts have been met with callous indifference. In order to save his Home from a wrongful foreclosure, he reasonably believes he has no other option but to bring this case.

4.  Kellner's Loan was originated by Movement Mortgage, LLC and subsequently placed in a mortgage-backed security guaranteed by Ginnie Mae.

5.  Lakeview Loan Servicing, LLC ("Lakeview") is the servicer of the Loan.

6.  Cenlar FSB *dba* Central Loan Administration & Reporting ("Cenlar") serviced the Loan, as subservicer for Lakeview, from shortly after origination of

2

the Loan, until March 2, 2017, at which time sub-servicing of the Loan was transferred to M&T Bank Corporation ("M&T Bank").

7.     M&T Bank has serviced the Loan, as subservicer for Lakeview, from March 2, 2017 to the present day.

8.     At all relevant times, Cenlar and M&T Bank, as sub-servicers, acted with the full authority of and as the servicing agent for Lakeview.

9.     Jurisdiction of claims against Lakeview, Cenlar and M&T Bank is conferred by 28 U.S.C. §1331 as this action arises under the Dodd-Frank Wall Street Reform and Consumer Protection Act (DFA), the Real Estate Settlement Procedures Act, 12 U.S.C. §§2601, *et seq*. (RESPA), and the Fair Debt Collection Practices Act, 15 U.S.C. §§1692, *et seq*. (FDCPA). This action is specifically filed to enforce regulations promulgated by the Consumer Finance Protection Bureau (CFPB) that became effective on January 10, 2014, specifically, 12 C.F.R. §§1024.35 and 1024.36 of Regulation X.

10.     This Court has supplemental jurisdiction to hear all state law claims pursuant to 28 U.S.C. §1367.

11.     Venue lies in this District pursuant to 28 U.S.C. §1391(b) as Kellner purchased the Home for his primary residence within this District, each defendant does business in this District, and the conduct complained of took place primarily in this District.

## SUMMARY OF CLAIMS

12.    In January 2013, the CFPB issued a number of final rules concerning mortgage markets in the United States, pursuant to the DFA, Public Law No. 111-203, 124 Stat. 1376 (2010).

13.    Specifically, on January 17, 2013, the CFPB issued the RESPA Mortgage Servicing Final Rules, 78 F.R. 10695 (Regulation X) (February 14, 2013), which became effective on January 10, 2014.

14.    The Loan in the instant matter is a "federally related mortgage loan" as said term is defined by 12 C.F.R. §1024.2(b).

15.    Cenlar and M&T Bank are each subject to the aforesaid regulations and each does not qualify for the exception for "small servicers", as such term is defined in 12 C.F.R. §1026.41(e)(4), nor the exemption for a "qualified lender", as such term is defined in 12 C.F.R. §617.700.

16.    Kellner asserts a claim for relief against Cenlar and M&T Bank for breaches of the specific rules under Regulation X as set forth, *infra*.

17.    Kellner has a private right of action under RESPA pursuant to 12 U.S.C. §2605(f) for the claimed breaches and such action provides for remedies including actual damages, costs, statutory damages, and attorneys' fees.

18.    Congress enacted the FDCPA to prohibit the "[u]se of abusive, deceptive, and unfair debt collection practices." 15 U.S.C §1692a.

4

19.     M&T Bank is a debt collector, Kellner is a consumer, and the Loan is a debt as defined by the FDCPA. Kellner asserts a private right of action under the FDCPA, pursuant to 15 U.S.C. §1692k, for M&T Bank's conduct in connection with collection of the Loan and Kellner is entitled to recover actual damages, statutory damages, costs, and attorneys' fees.

20.     Kellner also asserts claims against Lakeview, Cenlar and M&T Bank based upon state law breach of contract and for conduct which violates the Illinois Consumer Fraud and Deceptive Business Practices Act ("Fraud Act"), 815 ILCS 505/1 *et seq.*, which also entitles Kellner to recover actual damages, statutory damages, punitive damages, costs, and attorneys' fees.

## THE HISTORY OF KELLNER'S LOAN

21.     Pursuant to the terms of the Note and Mortgage, Kellner is required to make periodic payments of principal, interest as well as escrow deposits for the payment of estimated mortgage insurance, property taxes and hazard insurance and the servicer of the Loan is required to apply such payments in accordance with the terms of the Note and Mortgage.

22.     At the origination of the Loan, Kellner was provided with a "First Payment Letter" directing Kellner to pay on December 1, 2015 the following:

| | |
|---|---|
| Principal and Interest | $ 1,655.60 |
| Homeowner's Insurance | 103.67 |

| | |
|---|---|
| Mortgage Insurance | 239.47 |
| Property Taxes | 389.81 |
| City Property Taxes[1] | 243.51 |
| | |
| TOTAL PAYMENT: | $ 2,631.96 |

A copy of the First Payment Letter is attached as ***Exhibit 2***.

23.     The amounts for escrow totaling $976.46 are based upon an estimate provided to Kellner at origination of the Loan and set forth in an Initial Escrow Account Disclosure Statement ("Initial Escrow Disclosure"), a copy of which is attached as ***Exhibit 3***.

24.     The Initial Escrow Disclosure discloses total property tax disbursements estimated at $7,599.84 for the 2016 calendar year. *See Exhibit 3*.

25.     Kellner timely paid $2,632 for the payment due on December 1, 2015 to Cenlar and Cenlar applied that payment to the Loan on December 2, 2015. See Customer Account Activity Statement attached as ***Exhibit 4***.

26.     On January 7, 2016, Cenlar sent Kellner a Loan Statement, attached as ***Exhibit 5***, reflecting the application of his December 2015 payment. This Loan Statement set forth an amount due for January 2016 of $2,631.96 and indicated that the escrow balance for the Loan was then $4,039.39.

---

[1] Kellner is informed and believes that this reference is to property taxes as well. The Home has two property index numbers [10-13-214-018-0000 and 10-13-019-0000] assigned by the county. There is no "city Property Tax" in Evanston, Illinois.

27. Kellner timely paid $2,632 for the payment due on January 1, 2016 to Cenlar and Cenlar applied that payment to the Loan on January 7, 2016. *See Exhibits 4 and 5*.

28. On February 4, 2016, Cenlar sent Kellner a Loan Statement, attached as ***Exhibit 6***, reflecting the application of his January 2016 payment. This Loan Statement set forth an amount due for March 2016 of $2,631.96 and indicated a negative escrow balance of $8,388.47 for the Loan.

29. The February 2016 Loan Statement indicated under the heading "Transaction Activity (01/08/2016 to 02/04/2016)" a disbursement on 02/04/13 for "County Tax" in the amount of $12,925.38. *See Exhibit 6*.

30. The Customer Account Activity Statement attached as *Exhibit 4* reveals that Cenlar made an improper and unauthorized disbursement in the amount of $12,925.38 and improperly advanced $8,388.47, thus manufacturing a negative escrow balance as reflected on the February 2016 Loan Statement.

31. On March 4, 2016, Cenlar sent Kellner a Loan Statement, attached as ***Exhibit 7***, reflecting the application of his February 2016 payment. This Loan Statement set forth an amount due for April 2016 of $2,631.96 and indicated a negative escrow balance of $7,651.38 for the Loan.

32.     The Customer Account Activity Statement attached as *Exhibit 4* reveals that Cenlar refunded to itself $976.46 of the funds improperly advanced and that it had failed to restore funds to Kellner's escrow account.

33.     For the months of April through October of 2016, Cenlar sent Kellner a monthly Loan Statement, attached as ***Exhibits 8, 9, 10, 11, 12, 13, and 14***, each reflecting an amount due of $2,631.96.

34.     The Customer Account Activity Statement attached as *Exhibit 4* reveals that Cenlar continued to refund to itself amounts improperly advanced and that it had failed to restore funds to Kellner's escrow account.

35.     The August 4, 2016 Loan Statement, *Exhibit 12*, which Cenlar sent to Kellner, indicated under the heading "Transaction Activity (07/14/2016 to 08/04/2016)" a disbursement on 07/14/16 for "County Tax" in the amount of $12,825.26. This Loan Statement set forth an amount due for September 2016 of $2,631.96 and indicated a negative escrow balance of $16,791.79 for the Loan.

36.     Kellner timely paid each payment for the period of April through November, 2016. *See Exhibit 4*.

37.     On October 24, 2016, Cenlar sent Kellner its Annual Escrow Account Disclosure Statement ("Second Escrow Disclosure"), which is attached as ***Exhibit 15***.

8

38.   The Second Escrow Disclosure discloses total property taxes estimated at $25,750.64 for the 2017 calendar year, indicates an escrow shortage of $27,328.24 and recalculates the monthly payment due to be $6,430.88. *See Exhibit 15*.

39.   On November 4, 2016, Cenlar sent Kellner a Loan Statement, attached as ***Exhibit 16***, which reflects an amount due for December 2016 in the amount of $6,430.88 and that there is an existing negative escrow balance of $15,128.96.

40.   County property taxes for the Home for calendar year 2015, payable in 2016, totaled $7,672.85. See tax payment information attached as ***Exhibit 17***. This amount is in the same approximate amount estimated for the Initial Escrow Disclosure.

41.   Cenlar made disbursements in amounts far in excess of real estate taxes actually due on the Home. In particular, Cenlar claims to have disbursed $12,925.28 in February 2016 and $12,825.26 in July 2016 when the actual amounts due and paid to the county total $7,672.85 for the year. *See Exhibit 17*.

42.   On December 19, 2016, Cenlar sent Kellner a Loan Statement, attached as ***Exhibit 18***, which reflects an amount due for January 2017 in the amount of $13,119.00 and that there is an existing negative escrow balance of

$12,732.10. This statement reflects receipt by Cenlar of Kellner's timely payment of $2,632.00 on December 6, 2016.

43.     The December 19, 2016 Loan Statement, *Exhibit 18*, also reflects an improper assessment of a late charge of $257.24.

44.     On December 20, 2016, Cenlar sent Kellner a Delinquent Notice, attached as **Exhibit 19**, which falsely states that Kellner's payment due for December 2016 is unpaid, falsely states that a late fee is due and falsely states an Amount Due: $6,688.12.

45.     Kellner paid $2,632.00 to Cenlar for the December 2016 payment and this payment was received by Cenlar on December 6, 2016. *See Exhibit 4.*

46.     The Customer Account Activity Statement attached as *Exhibit 4* reveals that Cenlar continued to refund to itself amounts improperly advanced and that it had failed to restore funds to Kellner's escrow account.

47.     On January 3, 2017, Cenlar sent Kellner another letter, attached as **Exhibit 20**, again falsely stating that Kellner's payments due for December 2016 and January 2017 are unpaid and that "[t]o cure this default, please remit the total amount due of $13,119.00 immediately."

48.     On January 6, 2017, Cenlar sent Kellner a letter, attached as **Exhibit 21**, notifying him, falsely, that "your 2 mortgage payments for the months of

10

December and January have not been received and you are in default of your loan." The letter further advises that Kellner has been charged a late fee of $257.24.

49.     On January 18, 2017, Cenlar sent Kellner a letter, attached as *Exhibit 22*, notifying him, falsely, that he was in default and falsely stating an amount due of $13,376.24. In this letter, Cenlar also improperly claims that if Kellner does not pay the amounts claimed due that the Loan may be accelerated and the Home foreclosed and sold.

50.     Commencing with the January payment and continuing to the present, Cenlar falsely reported to one or more credit bureaus that Kellner had failed to timely pay the Loan payments and was past due.

51.     On February 17, 2017, Cenlar sent Kellner a Loan Statement, attached as *Exhibit 23*, which reflects an amount due for March 2017 in the amount of $26,511.49 and that there is an existing negative escrow balance of $27,365.25.

52.     The February 17, 2017 Loan Statement, *Exhibit 23*, which Cenlar sent to Kellner, indicated under the heading "Transaction Activity (01/18/2017 to 02/17/2017)" a disbursement on 02/17/2017 for "County Tax" in the amount of $14,162.86. In this statement, *Exhibit 23*, Cenlar also improperly imposes and requests that Kellner pay a late fee of $257.24 and a property inspection fee of $16.25.

53.    The Customer Account Activity Statement attached as *Exhibit 4* reveals that Cenlar continued to refund to itself amounts improperly advanced and that it had failed to restore funds to Kellner's escrow account.

54.    Cenlar transferred servicing of Kellner's Loan to M&T Bank effective March 2, 2017. See ***Exhibit 24***.

## KELLNER'S EFFORTS TO SEEK INFORMATION FROM CENLAR AND TO HAVE ERRORS CORRECTED

55.    Recognizing that Cenlar had made an egregious error with respect to the servicing of his Loan, fearing foreclosure, and unable to resolve the issue by paying amounts he knew to be correct, Kellner sought the assistance of legal counsel.

56.    By letter dated February 1, 2017, Kellner, through his counsel, sent correspondence captioned "Notice of Errors under 12 C.F.R. §1024.35(b)(11) for failing to properly calculate escrow payment; failure to apply payments pursuant to 12 C.F.R. §1024.35(b)(2) and for imposing fees for which the Servicer had no reasonable basis to impose pursuant 12 C.F.R. § 1024.35(b)(5)" consisting of or otherwise comprising a notice of errors pursuant to 12 C.F.R. §1024.35 alleging that Cenlar had committed a number of errors in the servicing of the Loan (the "Cenlar NOE #1"), specifically: (1) Pursuant to 12 C.F.R. § 1024.35(b)(11) for failure to perform escrow analysis accurately and calculate proper escrow payment

in violation of 12 C.F.R. § 1024.17(c) and 12 U.S.C. § 2609(a); (2) pursuant to 12 C.F.R. § 1024.35(b)(2) for failure to apply an accepted payment to principal, interest, escrow, or other charges under the terms of the mortgage loan and applicable law for the February and March 2016 Payments; and (3) pursuant to 12 C.F.R. § 1024.35(b)(5) for imposing fees for which the Servicer had no reasonable basis to impose, specifically, multiple late fees. A copy of Cenlar NOE #1 is attached as *Exhibit 25.*

57.    By and through Cenlar NOE #1, Kellner brought Cenlar's errors to the servicer's attention and requested that the errors be corrected.

58.    Cenlar received Cenlar NOE #1 on February 7, 2017. See tracking information attached as *Exhibit 26*.

59.    On February 23, 2017, Kellner, through his counsel, sent correspondence consisting of or otherwise comprising a request for information pursuant to 12 C.F.R. §1024.36 requesting detailed information related to Cenlar's servicing of the Loan (the "Cenlar RFI"). A copy of the Cenlar RFI is attached as *Exhibit 27*.

60.    Cenlar received the Cenlar RFI on February 28, 2017. See tracking information attached as *Exhibit 28*.

61.    On February 23, 2017, Kellner, through his counsel, sent correspondence consisting of or otherwise comprising a request for information

13

pursuant to 12 C.F.R. §1024.36 and 15 U.S.C. §1641(f)(2) requesting detailed information related to the current owner and servicer of the Loan (the "Cenlar TILA RFI"). A copy of the Cenlar RFI is attached as *Exhibit 29*.

62.    Cenlar received the Cenlar TILA RFI on February 28, 2017. See tracking information attached as *Exhibit 30*.

63.    Cenlar did not provide any acknowledgement or response to the Cenlar NOE, the Cenlar RFI or the Cenlar TILA RFI.

64.    By letter dated April 11, 2017, Kellner, through his counsel, sent correspondence captioned "Notice of Errors under 12 C.F.R. §1024.36 and 15 U.S.C. § 1641(F)(2)" alleged that Cenlar had committed servicing errors by failing to timely acknowledge or respond to the Cenlar TILA RFI or to provide any information requested ("Cenlar NOE #2"). A copy of Cenlar NOE #2 is attached as *Exhibit 31.*

65.    Cenlar received the Cenlar NOE #2 on April 17, 2017. See tracking information attached as *Exhibit 32*.

66.    By letter dated April 11, 2017, Kellner, through his counsel, sent correspondence captioned "Notice of Errors under 12 C.F.R. §1024.35(b)(11) for violation of § 1024.35(e)" alleged that Cenlar had committed servicing errors by failing to timely acknowledge or respond to the Cenlar NOE or to provide any

information requested ("Cenlar NOE #3"). A copy of Cenlar NOE #3 is attached as **Exhibit 33.**

67. Cenlar received the Cenlar NOE #3 on April 17, 2017. See tracking information attached as **Exhibit 34**.

68. By entirely ignoring, failing to acknowledge and failing to respond or provide any of the information requested by Kellner, Cenlar not only broke the law but also completely frustrated Kellner's earnest attempts to bring the errors in servicing of his Loan to Cenlar's attention so that those errors could be corrected.

69. By letter dated May 4, 2017, Cenlar provided a purported response to Cenlar NOE #2 and Cenlar NOE #3 (the "Cenlar Response"), a copy of which is attached as **Exhibit 35**.

70. The Cenlar Response did provide information regarding ownership, servicing and transfer of servicing of the Keller Loan, but otherwise failed to address the multiple servicing errors raised by Cenlar NOE #1 and Cenlar NOE #2.

### KELLNER'S EFFORTS TO SEEK INFORMATION FROM M&T BANK AND TO HAVE ERRORS CORRECTED

71. On March 13, 2017, Kellner, through his counsel, sent correspondence to M&T Bank consisting of or otherwise comprising a request for information pursuant to 12 C.F.R. §1024.36 requesting detailed information related

to M&T Bank's servicing of the Loan (the "M&T Bank RFI"). A copy of the M&T Bank RFI is attached as ***Exhibit 36***.

72.     By letter dated April 4, 2017, Kellner, through his counsel, sent correspondence captioned "Notice of Errors under 12 C.F.R. §1024.35(b)(11) for failing to properly calculate escrow payment; failure to apply payments pursuant to 12 C.F.R. §1024.35(b)(2) and for imposing fees for which the Servicer had no reasonable basis to impose pursuant 12 C.F.R. § 1024.35(b)(5)" consisting of or otherwise comprising a notice of errors pursuant to 12 C.F.R. §1024.35 alleging that Cenlar had committed a number of errors in the servicing of the Loan (the "M&T Bank NOE #1"), specifically: (1) Pursuant to 12 C.F.R. § 1024.35(b)(11) for failure to perform escrow analysis accurately and calculate proper escrow payment in violation of 12 C.F.R. § 1024.17(c) and 12 U.S.C. § 2609(a); (2) pursuant to 12 C.F.R. § 1024.35(b)(2) for failure to apply an accepted payment to principal, interest, escrow, or other charges under the terms of the mortgage loan and applicable law; and (3) pursuant to 12 C.F.R. § 1024.35(b)(5) for imposing fees for which the Servicer had no reasonable basis to impose, specifically, multiple late fees. A copy of M&T Bank NOE #1 is attached as ***Exhibit 37***.

73.     M&T Bank sent Kellner a response ("M&T Bank RFI Response") to the M&T Bank RFI on March 29, 2017, providing information regarding the

servicing of the Loan, an account transactional history and a payoff statement. A Copy of the M&T Bank RFI Response is attached as **Exhibit 38**.

74.     M&T Bank did not address or respond to the errors alleged by Kellner in the M&T Bank NOE #1. An examination of the transactional history provided by M&T Bank with the M&T Bank RFI Response reveals that the errors alleged by Kellner were not corrected, that M&T Bank simply continued to maintain an improper escrow, that M&T Bank continued to apply payments made by Kellner as contractually agreed, that M&T Bank continued to assess improper fees and charges, and that M&T Bank had simply ignored Kellner's earnest efforts to have the errors in servicing corrected.

75.     On March 17, 2017, M&T Bank sent Kellner a Mortgage Statement, attached as **Exhibit 39** which reflects an amount due for April 2017 in the amount of $32,926.12 and that there is an existing negative escrow balance of $27,600.38. This statement reflects receipt by M&T Bank of Kellner's timely payment of $2,632.00 on March 6, 2017.

76.     The March 17, 2017 Mortgage Statement, *Exhibit 39*, also reflects an improper assessment of a late charges totaling $771.72.

77.     On March 17, 2017, M&T Bank sent Kellner a letter, attached as **Exhibit 40**, captioned "DELINQUENCY INFORMATION" which falsely asserted

that Kellner had failed to make required payments and that the total amount required to bring the Loan current was $32,926.12.

78.    On March 21, 2017, M&T Bank sent Kellner a letter, attached as **Exhibit 41**, captioned "PAYOFF STATEMENT" which falsely stated the amount required to pay off the Loan and included a false claim that there existed an Escrow/Impound Overdraft of $27,600.38 and Late Charges Due of $771.72. This statement also reflects that M&T Bank assessed a "Recording Fee" of $50.00 which was not due or authorized.

79.    On April 17, 2017, M&T Bank sent Kellner a Mortgage Statement, attached as **Exhibit 42** which reflects an amount due for May 2017 in the amount of $39,385.00 and that there is an existing negative escrow balance of $26,864.30. This statement reflects receipt by M&T Bank of Kellner's timely payment of $2,632.00 on April 5, 2017.

80.    The April 17, 2017 Mortgage Statement, *Exhibit 42*, also reflects an improper assessment of a late charges totaling $771.72, "Return Item/Other Fee(s)" of $14.00 and "Recoverable Corporate Advance" of $14.00.

81.    In May, 2017 M&T sent Kellner three Mortgage Statements: May 4, 2017 (**Exhibit 43**), May 12, 2017 (**Exhibit 44**), and May 16, 2017 (**Exhibit 45**), which instruct Kellner to pay varying amounts ranging from $39,399 (*Exhibit 43*)

18

to $13,473.20 (*Exhibit 44*). Kellner was provided with no explanation as to the variance and was left totally confused as to the proper amount to pay.

82.     Due to the actions of Cenlar and M&T Bank, Kellner currently remains in a wrongful and false "default" status under the Loan despite his continued performance under the terms of the Loan.

83.     Throughout this entire ordeal, Kellner has merely wanted to pay what he is obligated to pay and live his life without fear of losing his Home to foreclosure. Even though he has made timely mortgage payments and correct escrow deposits, he finds himself in default, allegedly owing nearly $40,000 and on the brink of foreclosure.

### THE DAMAGE TO KELLNER

84.     Because of the wrongful and false "default" status on the Loan, Cenlar and M&T Bank have imposed a number of unwarranted fees on the Loan including improper late fees and improper default service fees, such as fees for property inspection, recording fees, other unidentified fees for corporate advances, and fees identified simply as "other," when the Loan was wrongfully and incorrectly deemed to be in default, that they refuse to remove from the Loan.

85.     The actions of Cenlar and M&T Bank, in wrongfully and falsely claiming that the Loan is in default, have caused Kellner to suffer harm to his credit.

86.     Specifically, because of the wrongful and false "default" status on the Loan, Cenlar has improperly and incorrectly reported to various Credit Reporting Agencies that the Loan was "90-119 Days Late."  See ***Exhibit 46***.

87.     On information and belief, M&T Bank has improperly and incorrectly reported to various, unknown Credit Reporting Agencies that the Loan was "30 Days Past Due" on at least one or more occasions.

88.     At the time that Kellner obtained the Loan, he received a disclosure that his credit score was 783. On May 24, 2017, Kellner received information that his credit score was 646.

89.     The reduction in Kellner's credit score is a direct result of the improper reporting by Cenlar and M&T Bank and the continued default status of the Loan.

90.     The actions of Cenlar and M&T Bank, in improperly disbursing sums for taxes not due and then advancing those funds from Kellner's escrow account created improper negative escrow balances.

91.     In subsequently refusing to correct their errors, Cenlar and M&T Bank have caused Kellner to incur legal expenses and damages in having to send various requests for information and notices of error to seek compliance with the law, and, once Kellner had exercised all reasonable options at his disposal, in filing the instant proceedings.

92.     Kellner sought to refinance the subject Loan and was initially offered a rate of 3%, but due to the negative impact on his credit profile caused by the default status of his Loan and the derogatory credit reporting, Kellner was prevented from taking advantage of this refinance opportunity. Additionally, Kellner was prevented from taking advantage of opportunities to refinance loans on investment property he held in Nevada and North Carolina. This refinancing would have reduced Kellner's rate from 5% to 4.25%.

93.     The wrongful and willful actions of Cenlar and M&T Bank have caused Kellner to suffer great emotional distress driven by the fear that he might lose and be forced to leave his Home. This fear has resulted in loss of sleep, anxiety, depression, embarrassment, and other significant emotional distress.

94.     At the time of the filing of this Complaint, M&T Bank has had more than Eight Hundred Forty (840) consumer complaints lodged against it nationally, specifically concerning the issue identified on the CFPB's consumer complaint database as as "loan servicing, payment, escrow account" related to mortgages. Each such complaint is filed and cataloged in the CFPB's publicly accessible online database. (http://www.consumerfinance.gov/complaintdatabase/).

## COUNT ONE: AGAINST LAKEVIEW, CENLAR AND M&T BANK
### [Breach of Contract]

95.     Kellner restates and incorporate all of his statements and allegations contained in paragraphs 1 through 94, in their entirety, as if fully rewritten herein.

96.     The Loan is an enforceable contract between Kellner and Lakeview, Cenlar, and M&T Bank.

97.     Cenlar disbursed funds for taxes which were not due on the Home.

98.     As a result, Cenlar debited Kellner's escrow account for the funds advanced creating a negative escrow balance.

99.     Cenlar then chose to repay itself from subsequent payments that Kellner made, thereby converting and misapplying funds and otherwise failing to apply the funds tendered in accordance with the terms of the Loan.

100.   Cenlar had no right to change the terms of the Loan or to impose an escrow for taxes which were not properly paid.

101.   Kellner continued to make monthly payments in the amount of $2,632.00 as required and agreed to pursuant to the Loan.

102.   Kellner alerted Cenlar to the errors alleged but Cenlar took no actions to correct its errors.

103.   Cenlar transferred servicing of the Loan to M&T Bank and thereafter M&T, as alleged *supra*, continued to maintain an improper escrow and to claim funds were payable by Kellner which were not due.

104.   Kellner alerted M&T Bank to the errors alleged but M&T Bank took no actions to correct its errors.

105.   Kellner has fully performed his obligations pursuant to the Loan by tendering payments due and by otherwise meeting each and every obligation imposed by the parties' contract.

106.   Implied in the Loan is a covenant of good faith and fair dealing. By their conduct as alleged *supra*, Cenlar and M&T Bank breached that covenant and thus breach their contractual obligations under the Loan.

107.   Cenlar and M&T Bank have each failed to exercise discretion in the servicing of the Loan. Each owed Kellner a fiduciary duty to handle escrow properly Each had discretion to adjust payments to recover escrow shortage or to allow that shortage to exist.  Cenlar and M&T Bank each breached their duty to Kellner and exercised their discretion in an oppressive and abusive manner by declining to apply Kellner's tender of payments unfairly, in bad faith and without reason and by otherwise misapplying those payments.

108.   Cenlar and M&T Bank have each failed to act in good faith and fairly by failing to correct servicing errors which have been brought to their attention when doing so was within their discretion as a mortgage loan servicer.

109.   Cenlar and M&T Bank actions have caused Kellner damage. In particular, Cenlar and M&T Bank have held Kellner's Loan in a state of default. As a direct and proximate result Kellner's credit standing has been diminished, and Kellner has had to incur legal fees to retain counsel to bring errors to the attention of Cenlar and M&T Bank and ultimately to prepare, file and prosecute this case to remedy the servicers' wrongful conduct.

110.   Lakeview is liable for the conduct of its agents, Cenlar and M&T Bank.

**WHEREFORE**, the Kellner prays for the entry of judgment in his favor and against Lakeview, Cenlar and M&T Bank, jointly and severally, as follows:

A. A finding that Lakeview, Cenlar and M&T Bank breached the Loan;

B. Awarding Kellner actual damages in an amount to be determined at trial;

C. Awarding the Kellner costs and reasonable attorneys' fees; and

D. Granting such other and further relief as is just and proper.

24

## COUNT TWO: AGAINST LAKEVIEW AND CENLAR
**[Cenlar's Failures to Properly Acknowledge and Respond to Requests for Information in Violation of 12 C.F.R. § 1024.36 and Cenlar's Failures to Properly Respond to Notices of Error in Violation of 12 C.F.R. § 1024.35(e)]**

111.   Kellner restates and incorporate all of their statements and allegations contained in paragraphs 1 through 94, in their entirety, as if fully rewritten herein.

112.   12 C.F.R. § 1024.35(a) provides that a "servicer shall comply with the requirements of this section for any written notice from the borrower that asserts an error and that includes the name of the borrower, information that enables the servicer to identify the borrower's mortgage loan account, and the error the borrower believes has occurred."

113.   Comment 1 of the CFPB's Official Interpretations of 12 C.F.R. §1024.35(a) provides that "[a] notice of error is submitted by a borrower if the notice of error is submitted by an agent of the borrower."

114.   12 C.F.R. § 1024.35(e)(1) provides that a servicer must respond to a notice of error by either "[c]orrecting the error or errors identified by the borrower and providing the borrower with a written notification of the correction, the effective date of the correction, and contact information, including a telephone number, for further assistance" or "[c]onducting a reasonable investigation and providing the borrower with a written notification that includes a statement that the servicer has determined that no error occurred, a statement of the reason or reasons

for this determination, a statement of the borrower's right to request documents relied upon by the servicer in reaching its determination, information regarding how the borrower can request such documents, and contact information, including a telephone number, for further assistance."

115.   Cenlar NOE #1, Cenlar NOE #2 and Cenlar NOE #3 each meet the requirements of a notice of error as defined by 12 C.F.R. § 1024.35(a).

116.   Kellner has alleged by and through Cenlar NOE #1, Cenlar NOE #2 and Cenlar NOE #3 that Cenlar committed multiple errors pursuant to 12 C.F.R. §1024.35(b)(2) by failing to provide all of the information and/or documentation requested by and through the Cenlar RFI, the Cenlar TILA RFI, and its failure to correct multiple servicing errors raised by Kellner.

117.   Cenlar's actions are a pattern and practice of behavior in conscious disregard for the Kellner' rights.

118.   As a result of Cenlar's actions, Cenlar is liable to Kellner for actual damages, statutory damages, costs, and attorneys' fees.

119.   Lakeview is liable for the conduct of its agent, Cenlar.

**WHEREFORE**, Kellner prays for the entry of judgment in his favor and against Lakeview and Cenlar, jointly and severally, as follows:

        A. A finding that Lakeview and Cenlar violated 12 C.F.R. §1024.35;

        B. Awarding Kellner actual damages and statutory damages in an

amount to be determined at trial;

C. Awarding Kellner costs and reasonable attorneys' fees; and

D. Granting such other and further relief as is just and proper.

## COUNT THREE: AGAINST LAKEVIEW AND M&T BANK
### [M&T Bank's Failure to Properly Respond to
### Notices of Error in Violation of 12 C.F.R. § 1024.35(e)]

120.    Kellner restates and incorporates all of his statements and allegations contained in paragraphs 1 through 94, in their entirety, as if fully rewritten herein.

121.    12 C.F.R. § 1024.35(a) provides that a "servicer shall comply with the requirements of this section for any written notice from the borrower that asserts an error and that includes the name of the borrower, information that enables the servicer to identify the borrower's mortgage loan account, and the error the borrower believes has occurred."

122.    Comment 1 of the CFPB's Official Interpretations of 12 C.F.R. §1024.35(a) provides that "[a] notice of error is submitted by a borrower if the notice of error is submitted by an agent of the borrower."

123.    12 C.F.R. § 1024.35(e)(1) provides that a servicer must respond to a notice of error by either "[c]orrecting the error or errors identified by the borrower and providing the borrower with a written notification of the correction, the effective date of the correction, and contact information, including a telephone number, for further assistance" or "[c]onducting a reasonable investigation and

27

providing the borrower with a written notification that includes a statement that the servicer has determined that no error occurred, a statement of the reason or reasons for this determination, a statement of the borrower's right to request documents relied upon by the servicer in reaching its determination, information regarding how the borrower can request such documents, and contact information, including a telephone number, for further assistance."

124.  M&T Bank NOE #1 meets the requirements of a notice of error as defined by 12 C.F.R. § 1024.35(a).

125.  Kellner has alleged by and through M&T Bank NOE #1 that M&T Bank committed multiple errors pursuant to 12 C.F.R. §1024.35(b)(2) by failing to provide all of the information and/or documentation requested by and through the M&T Bank RFI, the M&T Bank NOE #1, and its failure to correct multiple servicing errors raised by Kellner.

126.  M&T Bank's actions are a pattern and practice of behavior in conscious disregard for Kellner's rights.

127.  As a result of M&T Bank's actions, M&T Bank is liable to Kellner for actual damages, statutory damages, costs, and attorneys' fees.

128.  Lakeview is liable for the conduct of its agent, M&T Bank.

**WHEREFORE**, Kellner prays for the entry of judgment in his favor and against Lakeview and M&T Bank, jointly and severally, as follows:

28

A. A finding that Lakeview and M&T Bank violated 12 C.F.R. §1024.36;

B. Awarding Kellner actual damages in an amount to be determined at trial;

C. Awarding Kellner costs and reasonable attorneys' fees; and

D. Granting such other and further relief as is just and proper.

## COUNT FOUR: AGAINST LAKEVIEW, CENLAR AND M&T BANK
### [Violation of the Illinois Fraud Act, 815 ILCS 505/1]

129.  Kellner restates and incorporates all of his statements and allegations contained in paragraphs 1 through 94, in their entirety, as if fully rewritten herein.

130.  The Illinois Fraud Act at 815 ILCS 505/2, states, in relevant part:

*Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact... in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby.*

131.  The Illinois Fraud Act at 815 ILCS 505/2, states, in relevant part:

*Any person who suffers actual damage as a result of a violation of this Act committed by any other person may bring an action against such person. The court, in its discretion, may award actual economic damages or any other relief which the court deems proper.*

29

132.    Cenlar and M&T Bank violated the Fraud Act, specifically 815 ILCS 505/2, by engaging in an unfair and deceptive act or practice by using fraud, deception, and misrepresentation in their attempts to wrongfully breach the Loan which Kellner had dutifully performed so as to move towards the foreclosure of the Home. In particular, each servicer sent multiple, false and deceptive communications to Kellner, falsely claimed that Kellner owed amounts not due, falsely claimed that Kellner was required to pay late fees and other charges, falsely claimed the Loan to be in default, falsely stated that the Home was subject to foreclosure, falsely represented to third party credit reporting agencies that payments had not been timely made and that the Loan was in default.

133.    M&T Bank made a clear misrepresentation by and through the M&T Bank NOE Response in wrongfully claiming that it did not commit any errors in imposing an escrow account on the Kellner Loan and falsely claiming amounts which were not due despite errors having been brought to its attention repeatedly.

134.    Cenlar and M&T Bank violated the Fraud Act by exercising discretion given to each of them as escrowee in an abusive and oppressive manner. Each had the option of allowing the escrow shortage created by the erroneous payment of the wrong real estate taxes to exist. Each chose instead to recover that shortage from Kellner, while ignoring efforts to bring the error to their attention.

135.   Cenlar and M&T Bank's conduct occurred during the course of trade or commerce.

136.   Cenlar and M&T Bank, by and through their conduct, intended that Kellner would rely on its misrepresentations about the real estate taxes, the escrow and the Loan.

137.   Cenlar and M&T Bank's conduct, as detailed, *supra*, constitutes unfair conduct under the Fraud Act.

138.   Cenlar and M&T Bank's unfair and deceptive conduct was immoral, unethical, unscrupulous and oppressive, especially in that Cenlar and M&T Bank were each, at all times relevant, in a position of strength in relation to Kellner. Each owed Kellner a duty of good faith and fair dealing. Each owed Kellner a fiduciary duty as escrowee. Each had discretion with respect to its handling of escrow.

139.   Cenlar and M&T Bank's conduct violates public policy, including, the Fair Debt Collection Practices Act, because, as detailed herein, Cenlar and M&T used false and deceptive representations in connection with their collection of the Loan.

140.   On information and belief, Lakeview, Cenlar and M&T Bank, receive compensation for servicing loans that are in default which is greater that the compensation each receives for loans not in default. Additionally, Lakeview,

Cenlar and M&T Bank receive additional revenue for fees, including late fees, corporate advances, property inspections, and similar fees, which are charged to borrowers like Kellner for loans alleged to be in default. Thus, each has a financial incentive to place a loan serviced in default. By their conduct, Lakeview, Cenlar and M&T Bank sought to falsely place Kellner in default in order to receive greater compensation as servicers of his Loan and each sought to deceive him into paying those amounts through deception and multiple misrepresentation. Lakeview, Cenlar and M&T Bank chose to ignore Kellner's efforts to have the errors he identified corrected simply because they could and because they were motivated by profit rather than any desire to deal with Kellner in good faith and fairly.

141.   As pled, *supra*, Kellner has been harmed by, and continues to suffer from harm resulting from, the unfair and deceptive practices of Cenlar and M&T Bank in making misrepresentations described herein.

142.   In addition, Cenlar and M&T Bank's conduct has caused Kellner to suffer great emotional distress driven by the fear that he might lose the Home and be forced to leave the Home which has resulted in loss of sleep, anxiety, depression, embarrassment, and other significant emotional distress.

143.   Cenlar and M&T Bank's conduct, as pled, *supra*, was outrageous, willful, and wanton, and it showed a reckless disregard for the Kellner's rights.

144. In addition, due to the nature of Cenlar and M&T Bank's conduct, Kellner is entitled to recover punitive damages.

145. Lakeview is liable for the conduct of its agents, Cenlar and M&T Bank.

**WHEREFORE**, the Kellner prays for the entry of judgment in his favor and against Lakeview, Cenlar and M&T Bank, jointly and severally, as follows:

     A. A finding that Lakeview, Cenlar M&T Bank violated the Illinois Fraud Act;

     B. Awarding Kellner statutory damages;

     C. Awarding Kellner actual damages in an amount to be determined at trial;

     D. Awarding Kellner punitive damages in an amount to be determined at trial;

     E. Awarding Kellner costs and reasonable attorneys' fees; and

     F. Granting such other and further relief as is just and proper.

**COUNT FIVE: AGAINST LAKEVIEW AND M&T BANK**
**[Violation of the FDCPA, 15 U.S.C. §1692k]**

146. Kellner restates and incorporates all of his statements and allegations contained in paragraphs 1 through 94, in their entirety, as if fully rewritten herein.

147. M&T Bank took the actions described, *supra*, in an attempt to collect a debt represented by the Loan.

148. M&T Bank violated 15 U.S.C. §1692(e)(2) when they repeatedly and continuously misrepresented the character, amount, or legal status of the Loan. M&T Bank misrepresented to Kellner that he was in default on the Loan and that he was obligated to maintain an escrow account for the Loan in an incorrect amount that M&T Bank knew or had reason to know was in contravention of the terms of the Loan.

149. M&T Bank violated 15 U.S.C. §1692(e)(5), allegedly accelerating the Loan and threatening to take an action - commence foreclosure proceedings against Kellner - that cannot legally be taken as Kellner has fully satisfied any and all obligations under the terms of the Loan.

150. M&T Bank violated 15 U.S.C. §1692(e)(10) when they used false representations, through false Loan statements that the Loan was past-due and in default and deceptive means to attempt to collect the Loan.

151. M&T Bank violated 15 U.S.C. §1692(f) because their conduct, as outlined herein, constitutes an unconscionable means to collect or to attempt to collect a debt.

152. M&T Bank violated 15 U.S.C. §1692(d) by employing an unfair and unconscionable means to collect the subject debt.

153.    As pled, *supra*, Kellner has been harmed by, and continues to suffer from harm resulting from, the unfair and deceptive practices of M&T Bank in wrongfully breaching the Loan and in making misrepresentations to further effectuate their wrongdoing.

154.    Kellner was compelled to retain counsel send the various requests for information and notices of errors described hereinabove, and once Kellner had exercised all reasonable options at his disposal, the filing of the instant proceeding.

155.    To date, the potential of a foreclosure action against Kellner remains as a looming threat.

156.    Lakeview is liable for the conduct of its agent, M&T Bank.

**WHEREFORE**, Kellner prays for the entry of judgment in his favor and against Lakeview and M&T Bank, jointly and severally, as follows:

A.  A finding that Lakeview and M&T Bank violated the FDCPA;

B.  Awarding Kellner statutory damages;

C.  Awarding Kellner actual damages in an amount to be determined at trial;

D.  Awarding Kellner costs and reasonable attorneys' fees; and

E.  Granting such other and further relief as is just and proper.

## COUNT SIX: AGAINST LAKEVIEW, CENLAR AND M&T BANK
### [Negligent Infliction of Emotional Distress]

157.   Kellner restates and incorporates all of his statements and allegations contained in paragraphs 1 through 94, in their entirety, as if fully rewritten herein.

158.   Lakeview, Cenlar and M&T Bank each owed Kellner a duty of care to properly calculate escrow, disburse proper amounts from escrow, to correct errors in escrow when those errors were brought to the attention of the servicers, and to otherwise deal with Kellner in good faith and fairly.

159.   Lakeview, Cenlar and M&T Bank each are required pursuant to 12 C.F.R. § 1024.38 to maintain reasonable policies and procedures regarding servicing, to provide accurate and timely information, and to correct errors when they are raised.

160.   Lakeview, Cenlar and M&T Bank each breached their duty of care and their obligations to Kellner as servicers of the Loan.

161.   As alleged, *supra*, Kellner has suffered damage as a direct result of the conduct of Lakeview, Cenlar and M&T Bank.

**WHEREFORE**, Kellner prays for the entry of judgment in his favor and against Lakeview, Cenlar and M&T Bank, jointly and severally, as follows:

A.   A finding that Lakeview, Cenlar and M&T Bank were each willfully negligent;

36

B.     Awarding Kellner actual damages in an amount to be determined at trial;

C.     Awarding Kellner costs and reasonable attorneys' fees; and

D.     Granting such other and further relief as is just and proper.

## JURY DEMAND

Plaintiff hereby demands trial by jury.

*Respectfully submitted,*

**ROY KELLNER**

By: */s/ Rusty A. Payton*
        Rusty A. Payton

Rusty A. Payton
Marc E. Dann
PaytonDann
115 S. LaSalle Street, Suite 2600
Chicago, Illinois 60603
*payton@paytondann.com*
(312) 702-1000 - Phone/fax